No. 23-40098

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ELDEN DON BRANNAN,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

_____

**BRIEF FOR APPELLANT**

_____

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

## CERTIFICATE OF INTERESTED PERSONS
United States v. Elden Don Brannan,
No. 23-40098

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1.  District Judge: Hon. David S. Morales

2.  Magistrate Judge: Hon. Jason B. Libby

3.  Appellant: Elden Don Brannan

4.  Appellant's Counsel: Federal Public Defender Marjorie A. Meyers; and Assistant Federal Public Defenders Rachel E. Braver, Christopher A. Jenkins, and Evan G. Howze

5.  Appellee: United States of America

6.  Appellee's Counsel: United States Attorney Alamdar S. Hamdani; and Assistant United States Attorneys Joel Stacy Dunn and John Marck

s/ *Evan G. Howze*

EVAN G. HOWZE

ii

## REQUEST FOR ORAL ARGUMENT

Mr. Brannan requests oral argument. This appeal challenges the trial evidence as insufficient to support a conviction for possessing an unregistered "firearm"—here, an alleged "destructive device"—in violation of the National Firearms Act, 26 U.S.C. § 5861(d). It also challenges the district court's jury instructions as failing to convey the culpable mental state required to prove the charged offense. Both claims implicate complicated issues of statutory interpretation relating to the scope of the term "destructive device," 26 U.S.C. § 5845(f), and its interrelationship with the elements in a Section 5861(d) prosecution where, as here, the defendant himself created the alleged destructive device, and that device is ambiguous as to whether it was designed for use as an explosive weapon or for innocent purposes. Counsel submits that oral discussion of the relevant facts and legal authorities would thus benefit the Court.

## TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ....................................................................... i

Request for Oral Argument ................................................................................ ii

Table of Citations.............................................................................................. vi

Statement of Jurisdiction ................................................................................... 1

Statement of the Issues ...................................................................................... 2

Statement of the Case ........................................................................................ 3

Summary of the Argument ................................................................................. 7

Argument............................................................................................................ 8

I.   Mr. Brannan's intent to design the alleged "destructive device" for use as
     an explosive weapon was an essential element of the charged 26 U.S.C. §
     5861(d) violation................................................................................................ 8

     A.   Section 5861(d) requires the government to prove an alleged destruc-
          tive device was designed or redesigned for use as one of the categories
          of weapons enumerated in 26 U.S.C. § 5845(f), and that the defendant
          knew the characteristics revealing that intended design .............................. 10

     B.   Because Mr. Brannan made the alleged destructive device, the govern-
          ment had to prove he intentionally designed it for use as the relevant
          category of weapon—an "explosive bomb".................................................. 18

     C.   The district court mistakenly believed itself bound to treat the device's
          character as designed or redesigned for use as a weapon as a matter of
          affirmative defense ...................................................................................... 21

# TABLE OF CONTENTS – (cont'd)

**Page**

II.  Mr. Brannan's conviction for knowingly possessing a "destructive device" registerable under the National Firearms Act—specifically, an "explosive bomb"—rests on legally insufficient evidence ...................................................... 27

    A.    Standard of review .......................................................................... 27

    B.    The evidence was insufficient to prove that Mr. Brannan purposefully designed the item in his bedroom closet for use as an explosive weapon ................................................................................................. 27

III. The district court reversibly erred by failing to instruct the jury that the elements of the charged NFA offense required it to find that Mr. Brannan intentionally designed the alleged destructive device for use as an explosive weapon .......................................................................................... 34

    A.    Standard of review .......................................................................... 34

    B.    The district court's instructions did not properly convey the mental state required to find Mr. Brannan guilty of the charged offense ........................... 35

    C.    The government cannot show that this instructional error was harmless ...... 37

Conclusion ...................................................................................... 40

Certificate of Service ......................................................................... 41

Certificate of Compliance .................................................................... 42

# TABLE OF CITATIONS

**Page(s)**

## CASES

*Borden v. United States*, 141 S. Ct. 1817 (2021) ....................................... 16

*Burgess v. United States*, 553 U.S. 124 (2008) ........................................ 11

*Delaware v. Van Arshdall*, 475 U.S. 673 (1986) ........................................ 34

*In re Winship*, 397 U.S. 358 (1970) ............................................... 8

*Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375
  (5th Cir. 2008) ...................................................... 25

*Kotteakos v. United States*, 328 U.S. 750 (1946) ....................................... 34

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ........................................ 16

*Neder v. United States*, 527 U.S. 1 (1999) ............................... 8, 34, 37-38

*Ochoa-Salgado v. Garland*, 5 F.4th 615
  (5th Cir. 2021) ...................................................... 24

*Staples v. United States,* 511 U.S. 600 (1994) .................................. *passim*

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) ............................................ 8

*United States v. Anderson*, 885 F.2d 1248
  (5th Cir. 1989) (en banc) ...................................... 15, 17, 25

*United States v. Beason*, 690 F.2d 439
  (5th Cir. 1982) ....................................................... *passim*

*United States v. Charles*, 883 F.3d 355
  (5th Cir. 1989) ...................................... 19, 26, 33

*United States v. Dominguez-Benitez*, 542 U.S. 74 (2004) ........................................ 34

vi

# CASES (cont'd)

*United States v. Harbarger*, 46 F.4th 287
(5th Cir. 2022) .................................................................... *passim*

*United States v. Hunn*, 344 F. App'x 920
(5th Cir. 2009) .............................................................................. 19

*United States v. Hammond*, 371 F.3d 776
(11th Cir. 2004) ...................................................................... 21, 31

*United States v. Jennings*, 195 F.3d 795
(5th Cir. 1999) .............................................................................. 15

*United States v. Johnson*, 152 F.3d 618
(7th Cir. 1998) ...................................................................... 17, 19

*United States v. Koutsostamatis*, 956 F.3d 301
(5th Cir. 2020) .............................................................................. 12

*United States v. Price*, 877 F.2d 334
(5th Cir. 1989) .............................................................................. 19

*United States v. Reyna*, 130 F.3d 104
(5th Cir. 1997) ........................................................................ 9, 18

*United States v. Ross*, 458 F.2d 1144
(5th Cir. 1972) .................................................................... *passim*

*United States v. Shum*, 496 F.3d 390
(5th Cir. 2007) .............................................................................. 27

*United States v. Slaughter*, 238 F.3d 580
(5th Cir. 2000) .............................................................................. 38

*United States v. Spoerke*, 568 F.3d 1236
(11th Cir. 2009) .......................................................................... 33

*United States v. Vasquez*, 476 F.2d 730
(5th Cir. 1973) .............................................................................. 25

## CASES (cont'd)

*United States v. Vasquez*, 677 F.3d 685
  (5th Cir. 2012) ...................................................................... 34

## STATUTES, RULES, AND CONSTITUIONAL PROVISION

18 U.S.C. § 3742 ................................................................... 1

26 U.S.C. §  5801.................................................................. 3

26 U.S.C. §  5802.................................................................. 15

26 U.S.C. §  5812.................................................................. 15

26 U.S.C. §  5822.................................................................. 15

26 U.S.C. §  5841.................................................................. 15

26 U.S.C. § 5845(a)(8) .......................................................... 3

26 U.S.C. § 5845(f) ......................................................... *passim*

26 U.S.C. § 5861(d) ........................................................ *passim*

26 U.S.C. § 5871 ................................................................. 3

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 7801(a)(2)(A) ..................................................... 22

Fed. R. App. P. 4(b)(1) ........................................................ 1

U.S. Const. amend VI ......................................................... 8

## MISCELLANEOUS

Black's Law Dictionary Tenth Edition (2014) ................................ 12-13

## MISCELLANEOUS (cont'd)

Encyclopedia Britannica (2023),
   https://britannica.com/technology/weapon ........................................................... 11

Google Oxford Languages Online Dictionary,
   Oxford University Press ........................................................................................ 13

A. Scalia & B. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 12

Webster's II New College Dictionary (1995) ....................................................... 12

## STATEMENT OF JURISDICTION

The United States District Court for the Southern District of Texas entered judgment of conviction and sentence on February 9, 2023. Mr. Brannan timely filed notice of appeal on February 13, 2023. *See* Fed. R. App. P. 4(b)(1). This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

*Issue one*. Does Mr. Brannan's conviction for knowingly possessing a "destructive device" registerable under the National Firearms Act—specifically, an "explosive bomb"—rest on legally insufficient evidence?

*Issue two*. Did the district court reversibly err by failing to instruct the jury that the elements of the charged NFA offense required it to find that Mr. Brannan intentionally designed the alleged destructive device for use as an explosive weapon?

## STATEMENT OF THE CASE

In the National Firearms Act, 26 U.S.C. § 5801 *et seq.*, Congress utilized its taxing power to establish a comprehensive registration scheme as a means to federally regulate the manufacture, transfer, and possession of a particular subset inherently dangerous "firearms" and other similar weapons. The Act makes it a crime, punishable by up to 10 years, to possess an unregistered "firearm," 26 U.S.C. §§ 5861(d) & 5871. The Act elsewhere defines the term firearm to include, as relevant here, a "destructive device." §5845(a)(8). That term, in turn, is defined as reaching several specific categories of devices, one of which includes an "explosive bomb." §5845(f)(1)(A). The same definition instructs that the term destructive device "shall not include any device which is neither designed nor redesigned for use as a weapon." §5845(f). Thus, nonweapon items that can be and are even designed to explode—like fireworks—do not rank among the "destructive devices" one must register under the NFA. ROA.475.

Elden Don Brannan is the fireworks person in his family. ROA.446-47, 453-54. Born on the 3rd of July, Mr. Brannan has been "fascinate[ed]" with fireworks since he was a kid and hardly misses an occasion to set them off, particularly as a means of entertaining his sister's three kids, all of whom he lives with in Corpus Christi, Texas. ROA.453-54. He's the guy setting off fireworks even on New Years Eve. ROA.446-47.  Mr. Brannan's firework displays are "definitely a family activity." ROA.453. And he's "very safe with them, special when it comes to the small children." ROA.454.

This appeal arises from Mr. Brannan's conviction, after a jury trial, for allegedly possessing an unregistered "explosive bomb," in violation of Section 5861(d), in the form of a slender, six-inch metal pipe containing a mixture of black powder and pyrotechnic stars (the powder that makes the pretty colors from sparklers or when aerial fireworks explode), with a hobby fuse and a clay plug on one end, and a plastic bottle cap reinforced by some wax and five dimes on the other. ROA.30, 490-92, 505-06, 535-36, 543, 546-47, 565. Police found the suspected "pipe bomb" in the closet of Mr. Brannan's unlocked bedroom, next to a collection of commercial fireworks he still had from New Year's and resting on a Styrofoam tray next to one of those fireworks. ROA.451-52, 463; *see* ROA.923 (picture of the bomb).

At trial, there was no dispute that Mr. Brannan knowingly possessed the homemade metal item, or that he had not registered it with federal government. ROA.472-73. The critical contested issues centered on whether the metal item was in fact one that the NFA required to be registered, and whether Mr. Brannan possessed the mental state required under Section 5861(d). ROA.325-31, 437-38. As to those issues, the government relied on testimony from four ATF agents, including a designated expert, Senior Explosive Enforcement Officer Scott McCullough. ROA.458, 484, 513, 532.

The agents elaborated on the device's parts and explained what they did, and did not do, to analyze those components. A small sample of the powder mixture was sent to a lab and subjected to two tests: one that confirmed the chemical composition,

and thus identity, of the two powders; and another that confirmed the powder was "energetic"—i.e., that it "burned." ROA.492-93. The fuse, too, was sent off and confirmed to be energetic. ROA.493. No further analysis was done. No one attempted to detonate the item to see if it worked like a bomb. ROA.299-300, 558-60, 608. And no replica was made and tested. ROA.558-60. Agent McCullough opined, however, that he nonetheless believed the item "could" explode if the fuse were lit. ROA.548, 565. This was based on the assumption, he acknowledged, that the materials on the ends would create sufficient "confinement" so as to trap the gas produced from the burning powder long enough for that gas to expand and rupture, or "fragment," the metal pipe. ROA.537-38, 549-50, 565. If the device were to fragment, the agent further postulated, it would likely propel pieces of the pipe to some extent and cause some degree of harm to those nearby. ROA.538-39, 566. To his credit, Agent McCullough candidly acknowledged that he could only say what be believed the metal item "was capable of doing." ROA.295. But, "[a]s far as what [Mr. Brannan's] intent [wa]s, [he] ha[d] no idea." ROA.295. Because he believed the device "could" explode and would cause harm if it did, Agent McCullough testified that in his view the metal item qualified as a "bomb" and thereby a "destructive device." ROA.568-69.

Mr. Brannan put on a case in his defense, consisting of the testimony of his own explosives expert, Matthew Hefti, a former Air Force operational bomb technician of 12 years. ROA.580-84. Hefti testified that, in his opinion, the metal item's overall

composition, particularly in light of the absence of components one would expect to find in an improvised explosive weapon (like shrapnel, and metal caps designed to ensure confinement), indicated that the device was objectively designed to emit a pyrotechnic display from the unsealed end with the fuse, like a makeshift roman-candle or fountain firework. ROA.588-92. He thus opined that the item did not meet the requirements to be classified a "destructive device" under the NFA. ROA.584.

Mr. Brannan moved for judgment of acquittal, *see* Fed. R. Crim. P. 29, at the close of the government's case-in-chief, after his own case, and again at the close of all evidence, contending as relevant here that the government was required to prove that he intentionally designed the metal item for use as an explosive weapon, and that the evidence was insufficient on that score. ROA.279, 301, 574-77. The district court overruled the motions, *ibid.*, agreeing with the government's contention that the NFA did not oblige it to prove Mr. Brannan intended the item to function as a weapon, and that, under *United States v. Beason*, 690 F.2d 439 (5th Cir. 1982), the matter was one of affirmative defense for Mr. Brannan to prove if he wished. For the same reason, and over Mr. Brannan's strenuous objection, the court declined to instruct the jury as to his intent vis-à-vis the metal item's design. ROA.227-42.

The jury returned a verdict of guilty. ROA.339. The district court subsequently sentenced Mr. Brannan to 24 months' imprisonment and three years of supervised release. ROA.353. This timely appeal followed. ROA.129-30.

## SUMMARY OF THE ARGUMENT

Mr. Brannan challenges his National Firearms Act conviction on two fronts. Primarily, he contends that the trial evidence was legally insufficient to prove he acted with the culpable mental state 26 U.S.C. § 5861(d) requires in a case, like his, where an alleged "destructive device" is susceptible of both innocent and weaponized uses, and the defendant himself designed the ambiguous device. Alternatively, he argues that the district court's failure to instruct the jury on the requisite mental state is an error that should undermine this Court's confidence in the trial's outcome.

Because the proper interpretation of the NFA's definition of "destructive device," as incorporated into Section 5861(d), is critical to both claims, Mr. Brannan will start by **(I)** demonstrating that his intent to design the metal item in his bedroom closet as a weapon—here, as an "explosive bomb"—was an essential offense element. Next, Mr. Brannan will **(II)** show that the government's evidence was insufficient to permit a rational juror to conclude, without also reasonably doubting, that he in fact designed the metal item to explode as a means of inflicting bodily harm or physical damage— i.e., as a weapon. Last, Mr. Brannan **(III)** explains why, even if the evidence crossed the sufficiency line, the verdict is too unreliable because the jury instructions did not convey that Mr. Brannan's intent to make an explosive weapon was essential to his guilt, and the government cannot carry its burden to show beyond reasonable doubt that a properly instructed jury would have voted to convict.

# ARGUMENT

## I.    Mr. Brannan's intent to design the alleged "destructive device" for use as an explosive weapon was an essential element of the charged 26 U.S.C. § 5861(d) violation.

The Sixth Amendment "right to a speedy and public trial, by an impartial jury," U.S. Const. amend VI, includes, "as its most important element, the right to have the jury" make "the requisite finding of 'guilty.'" *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993). The Due Process Clause, in turn, places on the prosecution "the burden of proving all elements of the offense charged" and "persuad[ing] the factfinder 'beyond reasonable doubt' of the facts necessary to establish each of those elements." *Id.* at 277-78 (citing, *inter alia*, *In re Winship*, 397 U.S. 358, 364 (1970)). And so, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt" on every element of the charged offense. *Id.* at 278. A "trial d[oes] not result in a 'complete verdict,'" however, where the court's instructions to the jury misdescribe, omit, or conclusively presume an element. *Neder v. United States*, 527 U.S. 1, 11-12 (1999). An "improper instruction on an element of the offense" thus "violates the Sixth Amendment's jury trial guarantee." *Id.* at 12.

It is well established that, to prove a violation of 26 U.S.C. § 5861(d), the government must prove the defendant possessed a "firearm" the National Firearms Act required him to register, including any "destructive device" as defined in 26 U.S.C. § 5845(f), and it must prove that the defendant knew all the characteristics that brought

the alleged firearm within the NFA's relevant definition of that term. *Staples v. United States*, 511 U.S. 600, 619-20 (1994) (so holding as to a "machinegun"); *accord United States v. Reyna*, 130 F.3d 104, 107-09 (5th Cir. 1997) (applying *Staples* to all Section 5861(d) firearms). By its express terms, Section 5845(f) excludes "any device neither designed nor redesigned for use as a weapon" from the meaning of the term "destructive device," and thus, from the class of "firearms" within Section 5861(d)'s ambit.

There is no dispute that Mr. Brannan himself created—and so, "designed"—the metal item kept stored in his bedroom closet and alleged to be the "destructive device" he unlawfully failed to register. At trial, the government argued, and the district court agreed over objection, that it had no duty to persuade the jury that Mr. Brannan purposefully designed the metal item for use an explosive weapon, and that the NFA instead placed the burden on Mr. Brannan, as a matter of affirmative defense, to convince the jury that he lacked that intent.

This was mistaken. Section 5845(f)'s exclusion of devices not designed or redesigned for use as a weapon confirms what is apparent from its text, context, and purpose: the list of enumerated "destructive devices" is narrow, and limited to devices designed for the purpose of weaponizing their ability to either explode, burn, emit poison gas, or propel large projectiles. That is, purposeful design (or redesign) as a weapon is one of the essential "features that make" such a device "a statutory 'firearm'" subject to Section 5861(d)'s proscription. *Staples*, 511 U.S. at 609. The upshot

is that, in order to prove unlawful possession of an alleged "destructive device," the government is obliged to prove the device was made or modified for use as one of the categories of weapons enumerated in Section 5845(f), and that the defendant knew the characteristics revealing that intended design. As this Court recently held in *United States v. Harbarger*, 46 F.4th 287 (5th Cir. 2022), it follows that, in cases like Mr. Brannan's—where the allegedly registerable device was also designed by the defendant, and is susceptible of both innocent and destructive uses—Section 5861(d) requires the government to prove, and the jury to find beyond reasonable doubt, that the defendant purposefully designed the device to function as the relevant category of weapon—here, as in *Harbarger*, an "explosive bomb."

    **A.    Section 5861(d) requires the government to prove an alleged destructive device was designed or redesigned for use as one of the categories of weapons enumerated in 26 U.S.C. § 5845(f), and that the defendant knew the characteristics revealing that intended design.**

The analysis begins—and here, ends—with the text. Section 5861(d) instructs that: "It shall be unlawful for any person . . . (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." As is apparent, the statute defining the charged offense is silent as to the characteristics of the "destructive devices," and indeed, the "firearms," that come within its reach. So, we must rely exclusively on Section 5845(f)'s definition to identify the essential

features of a qualifying "destructive device," and to make sense of the impact of their elemental assimilation into the charged Section 5861(d) offense.

Section 5845(f) delineates what the term destructive device "means," and thus signals that it "excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (quoted source omitted). The statute proceeds to list three categories of covered devices:

> (1)  any explosive, incendiary, or poison gas (A) *bomb*, (B) *grenade*, (C) *rocket* having a propellent charge of more than four ounces, (D) *missile* having an explosive or incendiary charge of more than one-quarter ounce, (E) *mine*, or (F) similar device;

> (2)  any type of *weapon* by *whatever name known* which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and

> (3)  any combination of parts either designed or intended for use in *converting* any device *into* a destructive device *as defined in subparagraphs (1) and (2)* and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f)(1)-(3) (emphasis added). On face, the first two categories consist entirely of military-style *weapons*—"instruments used in combat for the purpose of killing, injuring, or defeating an enemy"[1]—with one of four distinct capabilities: to explode, to spread fire and burn, to release poison gas, or to propel large projectiles.

---

[1] Encyclopedia Britannica, *Weapon*, (2023), https://britannica.com/technology/weapon (last visited July 17, 2023).

The commonsense, ordinary meaning of these undefined terms reinforces this. A "bomb," for instance, is commonly understood to be "[a]n explosive weapon that can be detonated by impact, trigger, fuse, proximity, timing device, or remote control." Black's Law Dictionary Tenth Edition, *Bomb*, at 210 (2014). A "grenade" is a "weapon containing priming and bursting charges, designed to be thrown by hand or fired from a rifle equipped with a launcher." Webster's II New College Dictionary, *Grenade*, at 489 (1995). Missiles and rockets hardly require reference to dictionaries. In context, we can be sure that "mine" refers not to "an underground or in-ground excavation from which mineral or ore can be extracted," but rather "an explosive device for de-stroying enemy personnel, fortification, or equipment, often in a concealed position and designed to be detonated by contact, by a time fuse, or electronically." *Id.*, *Mine*, at 697. And, under the maxim *ejusdem generis*, "a more general term [that] follows more specific terms in a list" is "usually understood to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *United States v. Koutsostamatis*, 956 F.3d 301, 308 (5th Cir. 2020); *see generally* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 199-202 (2012) (discussing this canon). So, the general term "similar device" is necessarily limited to devices that share the same essential qualities as the specific devices that precede it: explosive, incendiary, or poison-gas weapons with no legitimate civilian use. *See United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972) (construing "similar device" to cover a

homemade "Molotov cocktail" because the device "ha[d] no use other than as a weapon, and a person may be charged with knowledge of its similarity to a grenade").

Context also makes clear that we are dealing with devices purposefully made or converted to function as weapons. These are not items or instruments that simply *could* be used as weapons although not designed as such, like a car, or scissors, or a kitchen knife. Nor are they items that, although weapons by design, have legitimate utility for sporting, hunting, or other civilian endeavors. No—bombs, grenades, rockets, missiles, and mines, especially as modified by the adjectives "explosive" and "incendiary," or the compound adjective "poison gas," 26 U.S.C. § 5845(f)(1), are all devices *designed* for the very purpose of allowing the ultimate user to employ their destructive capacities as a weapon—that is, "for inflicting harm or physical damage,"[2] or "to kill or injure someone."[3] The same is true of the large-projectile launchers covered by category two, which is explicit in that it reaches only "weapon[s]" that possesses the listed qualities. §5845(f)(2). And category three consists entirely of "combination[s] of parts" that are "designed or intended" to be used to "convert[] any device into" a weapon in the first two categories. §5845(f)(3).

Thus, even if the language quoted  above was the only statutory text to draw from, the plain and ordinary meaning of that text, in context, makes clear that Section

---

[2] Google Oxford Languages Online Dictionary, *Weapon*, Oxford University Press (accessed July 17, 2023, by Googling "weapon definition").

[3] Black's Law Dictionary, *supra*, *Weapon*, at 1827.

5845(f) covers devices and combinations of parts that, by design, are meant to be employed as weapons of physical destruction. That inherent textual limitation to Section 5845(f)'s scope ensures that only devices made to either weaponize explosives, fire, or poison, or to weaponize the capacity to expel large-bore projectiles, are made subject to the NFA's restrictions. This, in turn, ensures that common items with legitimate commercial and private uses need not be preapproved and preregistered with the federal government on pain of criminal sanction. Sticks of commercial dynamite and aerial fireworks—although designed to explode, and capable of causing great harm if misused—are not registerable "explosive *bombs*." §5845(f)(1). A "drip torch" is not an "incendiary *grenade*" or other "*similar* device" even though it is designed to ignite and spread fires for use in controlled burns. *Ibid*. And commercial "potato cannons" and large "spud guns" are not among the class of registerable projectile weapons, despite the fact that they are designed to "expel a projectile by the action" of a "propellant" and commonly sport a barrel "bore of more than one-half inch in diameter." §5845(f)(2). As paragraph (f)(3) makes clear, these and other items that are capable of and even designed to explode, burn, emit poison, or launch projectiles, but are not designed to be weapons, become registerable "destructive devices" only if altered or combined with other devices for the purpose of converting them into one of the covered types of weapons.

14

This reading is consistent with the overall purpose of the statutory scheme. Firearms, even apart from the NFA's quixotic definition, are by their very nature designed as weapons. *See United States v. Anderson*, 885 F.2d 1248, 1250-51 (5th Cir. 1989) (en banc). The various "destructive devices" listed in Section 5845(f) are a sub-category of the specific class of "firearms" that Congress has deemed so "inherently dangerous and generally lacking usefulness, except for violent and criminal purposes," *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999), that they must be registered with and approved by the federal government, on pain of up to 10 years' imprisonment, in advance of being made, transferred, or taken into possession. *See* 26 U.S.C. §§ 5802, 5812, 5822, 5841 & 5861. That is, like *all* "firearms" covered by the NFA, "destructive devices" are those that have been intentionally designed or modified in such a way as to operate as weapons capable of inflicting grievous harm on other people or their property, and to thus merit strict circumscription of their allowable use, if any, by civilians.

Of course, the language setting out the three categories of "destructive devices" is not the only statutory text at our disposal. As noted, Section 5845(f) also expressly states that the term destructive device "shall not include"—and so, excludes—"any device which is neither designed nor redesigned for use as a weapon." This Court long ago interpreted this phrase to function as a "crucial limitation" that means precisely

what it says: "device[s] not designed or redesigned for use as a weapon" are not covered. *Ross*, 458 F.2d at 1145.

The import of that limitation is just as clear: it confirms that the categories of "destructive devices" in Section 5845(f)(1)-(3), and thus subject to Section 5861(d), are restricted to devices made (or modified) for the purpose of bringing one of the corresponding destructive capabilities to bear "for use as a weapon"—that is, to explode, burn, release poison gas, or propel large projectiles as a means of inflicting bodily harm or physical damage. The verbs "designed" and "redesigned" imply the intentional creation of a thing, or the intentional modification of an existing thing, to have a specific function and serve a specific purpose. The phrase "for use as a weapon" identifies that function and purpose, and itself carries an implication of intended design. "Use," while an "elastic" term, in this context connotes prospective, "active employment," *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004), and, when modified by the phrase "as a weapon," further indicates the anticipated future employment of the object so designed (or redesigned) in a particular manner—to blow something, or someone, up. *Cf. Borden v. United States*, 141 S. Ct. 1817, 1825 (2021). That the verbs "designed" and "redesigned" are in the past tense, moreover, makes clear that the focus is on the device's purpose when it was made or modified. In other words, it is the intent of the device's designer (or redesigner), as expressed through objective design choices and other direct or circumstantial evidence, to make a covered weapon—and

16

not whether the present possessor actually intends to use the device for that purpose—that matters. *See United States v. Johnson*, 152 F.3d 618, 627 (7th Cir. 1998). In lock-step with the text, context, and purpose already fleshed out, this "crucial limitation," *Ross*, 458 F.2d at 1145, confirms that the statute's reach extends only to devices that, by their design or redesign, and at the time of creation or modification, were intended to be employed as weapons of physical destruction.

In short, plain meaning and the ordinary interpretive tools reveal that the NFA sets the dividing line between the devices that come within Section 5861(d)'s ambit, and those that don't, at the intent of the designer (or redesigner) to make one of the listed types of weapons. A device's character as having been designed or redesigned to function as the relevant weapon type—here, an explosive bomb—is thus an essential element. When the government alleges the knowing possession of an unregistered "explosive bomb" in violation of Section 5861(d), as it did here, it has alleged the knowing possession of a device purposefully designed to explode as a weapon. It must therefore prove the device was so designed.

In addition to flowing from the text, this interpretation is a necessary outgrowth of, and corollary to, the decisions of this Court sitting en banc, *Anderson*, 885 F.2d at 1256-59, and of the Supreme Court, *Staples*, 511 U.S. at 609, construing Section 5861(d) to punish only those individuals who *know* the characteristics that bring a firearm within the ambit of the NFA's registration scheme. As this Court subsequently

17

held, *see Reyna*, 130 F.3d at 107-09, *Staples* made clear that the government must prove the defendant knew "the particular characteristics that make his weapon a statutory firearm," 511 U.S. at 609, and this applies no less to the particular characteristics bringing an alleged destructive device within the relevant weapon category (or categories) outlined in Section 5845(f). To have that culpable mental state vis-à-vis an "explosive bomb," then, the defendant must know the device is an explosive bomb. As we have seen, that means, at bottom, he must know the features of the device revealing that it was designed, or modified, to allow the user to inflict bodily harm or physical damage through its explosive capability. If a defendant was unaware of those features, then he did not know he had a "bomb" the NFA required him to register any more than an individual unaware that his AR-15 is capable of firing automatically with a single function of the trigger knows he has a registerable "machinegun." That is, he never possessed the culpable mental state to begin with.

> **B.    Because Mr. Brannan made the alleged destructive device, the government had to prove he intentionally designed it for use as the relevant category of weapon—an "explosive bomb."**

That brings us to the specific application of these principles to the allegation that Mr. Brannan's possession of the explosives-containing metal item in his closet established that he knowingly possessed an unregistered "explosive bomb." As Mr. Brannan has shown, an alleged destructive device's character as designed for use as

an explosive weapon is a fact essential to establishing that it was a registerable "explosive bomb" under the NFA, and so unlawful to possess under Section 5861(d). And the defendant's knowledge of that characteristic is a fact essential to establishing the culpable mental state required under *Staples*. The question here is to what extent, if any, these requirements necessitate an elevated *mens rea* finding in a case like Mr. Brannan's: where the defendant himself designed the explosives-containing device, but that device is one that, as constructed, could be put to both innocent and destructive uses?[4]

---

[4] The courts of appeals, including this Court, uniformly hold that homemade or improvised devices—whether created by the defendant or someone else—are proscribed under Section 5861(d) if shown to possess the essential features of one of the explosive, incendiary, poisonous, or projectile weapons listed in Section 5845(f). *See, e.g.*, *United States v. Hunn,* 344 F. App'x 920, 921 (5th Cir. 2009) (citing *United States v. Price*, 877 F.2d 334, 337 (5th Cir. 1989)) (pipe bombs); *Ross*, 458 F.2d at 1145 (Molotov cocktail). The circuits are much less uniform as to whether, and to what extent, a defendant's intent becomes relevant, and indeed, elemental, in cases where he is also the device's designer. Where a defendant-made device is clearly designed so as to have no useful function other than to act as one of the covered weapon types, the prevailing view is the defendant's intent is not relevant. *See Johnson*, 152 F.3d at 623-28 (7th Cir.) (cataloguing various views and cases).

In Mr. Brannan's view, this rule is misguided. As detailed above, Section 5845(f)'s text is clear in that the listed categories consist only of devices purposefully designed or redesigned to be used as weapons. If the defendant is the designer of an allegedly proscribed device, then whether he designed that device to be used (by him or someone else) as one of those weapons is a fact essential to establishing his culpability, *see Harbarger*, 46 F.4th at 290, and this should not change merely because the device clearly has all the trappings of a covered device and none of the trappings of an innocent one. The better view in light of the text, and arguably adopted in *United States v. Charles*, 883 F.3d 355, 357 (5th Cir. 1989), and endorsed by *Harbarger* at the pincite just noted, is that the defendant's intent to design the device as a weapon remains an element; but proof that the device has all the characteristics of a covered weapon, and is not susceptible of innocent use, is sufficient to prove culpable intent vis-à-vis the device's design. *See Charles*, 883 F.3d at 357 (so holding). The proper import of the defendant's intent in such a case is a matter for another day, however, because Mr. Brannan's case squarely implicates *Harbarger*'s rule for ambiguous devices, discussed next.

This Court provided the answer in *Harbarger*, 46 F.4th 287. That case involved a defendant, like Mr. Brannan, accused of violating Section 5861(d) through his alleged unlawful possession of an improvised explosive "pipe bomb," in the form of a 7.5-inch long cylindrical "bamboo stick." *Id.* at 288. The trial evidence showed that the bamboo tube housed an unknown amount of low-explosives powder (pyrodex), was secured with a plastic bottle cap reinforced by pennies on one end and a fuse on the other, could have exploded if ignited, and would fragment if it did explode, hurling broken bamboo shards, as well as the pennies, in a destructive manner. *Id.* at 288, 288 nn.3-4, 291. Like Mr. Brannan, the defendant was also the device's designer, and he likewise contested the sufficiency of the evidence of its character as designed to explode as a weapon both at trial and on appeal. *Id.* at 289.

The Court thus noted that the "determinative issue" raised by the defendant's sufficiency challenge was "whether an explosive-containing device falls within the NFA when it is susceptible of both innocent and destructive uses and not clearly designed as a weapon." *Ibid.* After surveying case law from this and other circuits, the Court held that, in cases posing that scenario, "evidence of scienter or evidence that the device can be used solely for illegal purposes *is necessary to sustain a conviction*." *Id.* at 290 (emphasis added). In doing so, the Court agreed with the Eleventh Circuit, emphasizing that, under the NFA, "a device is not illegal simply because it explodes;

it must also be *designed* for use as a weapon." *Id.* at 291 (citing *United States v. Hammond*, 371 F.3d 776, 780 (11th Cir. 2004)) (*Harbarger*'s emphasis). As discussed in greater detail later, the Court agreed that the evidence—bearing a striking resemblance in both quality and quantity to that present here—was "insufficient to prove that the bamboo stick was an illegal explosive device 'designed' as a weapon" and accordingly reversed the conviction. *Id.* at 292.

*Harbarger* makes clear that, as in that case, Mr. Brannan's intent to design the alleged unlawful device for use as an explosive weapon was an elemental fact the government had to prove to the exclusion of any reasonable doubt in this case. And it was therefore a fact that the court's instructions were required to fully and accurately convey to the jury as a necessary prerequisite to establishing Mr. Brannan's culpability for the charged Section 5861(d) offense. As Mr. Brannan demonstrates below, neither of these things occurred in this case.

### C.    The district court mistakenly believed itself bound to treat the device's character as designed or redesigned for use as a weapon as a matter of affirmative defense.

At trial, both in moving for judgment of acquittal and in objecting to the jury instructions, Mr. Brannan implored the district court to follow *Harbarger*. ROA.230-31, 234-35, 575. And there is no doubt as to the presence of the predicate ambiguity, as to the alleged destructive device's intended design, needed to trigger *Harbarger*. Indeed, the district court itself characterized the government's case as having "chinned

the bar minimally enough for it to go forward" in denying Mr. Brannan's motion for acquittal, ROA.577-78, and remarked that, in its view, "the jury could go either way on" whether the metal item "meets the criteria of an explosive bomb" at the charge conference. ROA.239. But, at the government's urging, the district court ruled that *United States v. Beason*, 690 F.2d 439 (5th Cir. 1982), controlled, not *Harbarger*; agreed with the government that it had no duty under *Beason* to prove that an alleged explosive bomb was designed to explode as a weapon, much less prove that Mr. Brannan harbored that intent; and agreed with the government that, under *Beason*, the matter of intended design was a matter of affirmative defense that Mr. Brannan would bear the burden to prove if he invoked it (which he did not).[5] ROA.237-40. For at least three reasons, this was error.

In *Beason*, the defendant argued that the government "did not present evidence" that the five homemade grenades he and a friend sold, as such, to an undercover agent were designed as weapons and had not been deemed unlikely to be used as weapons by the Attorney General.[6] 690 F.2d at 442, 445. The government responded by arguing that Section 5845(f)'s language excluding devices "neither designed nor redesigned

---

[5] In light of the district court's impression that *Beason* relieved the government of any obligation to prove beyond a reasonable doubt that Mr. Brannan intended to design the metal item from his closet as an explosive weapon, the court's observations that the evidence was "minimally" sufficient to go forward, and that the jury "could go either way," throw the weakness of the government's case into even starker relief.

[6] The term "Secretary" as used throughout the provisions of the NFA, including Section 5845, "mean[s] the Attorney General." 28 U.S.C. § 7801(a)(2)(A).

for use as a weapon," as well as "any other device which the Secretary finds is not likely to be used as a weapon," §5845(f), represented "statutory exceptions" to liability (in contrast to exclusions or limitations on the statute's scope), and therefore constituted affirmative defenses. *Beason*, 690 F.2d at 445. Accepting that premise, this Court "first" found "that the exceptions contained in the definition of destructive device should be treated as affirmative defense rather than as part of the elements of the offense," and then held that the government had rebutted the defendant's showings on that point. *Ibid.* Notably, the district court in *Beason* had nevertheless instructed the jury as to the language setting out the designed-as-a-weapon limitation. *Ibid*.

To start, as relevant here, *Beason* addressed only the language excluding devices not designed or intended for use as weapons from the definition of "destructive device." It had nothing to say about the best interpretation of the language setting out the three categories of covered devices—i.e., §5845(1)–(3). It had nothing to say about whether the defendant's intent to create a weapon is implicated in a case in which he himself has designed an ambiguous device. And, as a pre-*Staples* decision, it necessarily had nothing to say about the extent to which the *Staples* knowledge requirement bore on that question.

Here, in his trial objections to the jury instructions, Mr. Brannan not only relied on the express statutory exclusion, but he also specifically argued that a device's character as purposefully designed as weaponry is a limitation that both inheres in the term

23

"explosive bomb" and is necessary to give effect to *Staples*' knowledge requirement. *See* ROA.228 (asserting, as support for instructing on Mr. Brannan's intent to design a weapon, "that there is some level of intentionality or design in the definition, in the term, 'explosive bomb'"); ROA.231 (arguing that so instructing the jury was also appropriate given that Mr. Brannan "has to knowingly possess it [the metal item] and he has to know it's a destructive device. . . . And so he has to know that this thing was made to explode"). As Mr. Brannan has shown above, those contentions were correct. Separate and apart from the express exclusion, purposeful design as a weapon of the relevant type is a limitation inherent in the text setting out the covered device categories. And it is also integral to that text's synergy with Section 5861(d)'s corresponding demand for proof that Mr. Brannan *knew* the characteristics that allegedly qualified the device he himself designed as an explosive bomb.

*Beason* did not speak to those interpretive contentions, and thus does not foreclose them here. *See Ochoa-Salgado v. Garland*, 5 F.4th 615, 619 (5th Cir. 2021) (holding that the rule of orderliness is inapplicable where an issue was neither raised by a party nor given reasoned consideration by the prior panel). And because *Beason* did not speak to the circumstances present both here and in *Harbarger*—an ambiguous device, made by the defendant—it likewise did not preclude the district court from following the course *Harbarger* clearly dictated.

In any event, *Beason* is not controlling even as to the proper construction of the language that expressly excludes devices "neither designed nor redesigned for use as a weapon" from the purview of Section 5845(f). First, *Beason*'s characterization of the weapon-by-design language as an "exception" cannot be squared with *Ross*'s prior construction of that language as a "crucial *limitation*" on Section 5845(f)'s breadth. *Ross*, 458 F.2d at 1145 (emphasis added). As *Ross* rightly perceived, the NFA's admonition that the term destructive device "shall not include any device which is neither designed nor redesigned for use as a weapon" is not a proviso that has the effect of excepting from punishment conduct that would otherwise be illegal under Section 5861(d); rather, it limits the scope of the conduct that Section 5861(d) makes illegal to begin with. As the first-in-time, published decision, *Ross*'s interpretation does implicate the rule of orderliness, and so controls. *See Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008).

Second, even apart from its irreconcilability with *Ross*, *Beason* reached its affirmative-defense finding pre-*Anderson* and pre-*Staples*—when this Court's precedent did not require proof of *any* mental state vis-à-vis the characteristics that bring a "firearm" within Section 5861(d). *See United States v. Vasquez*, 476 F.2d 730 (5th Cir. 1973). After *Anderson* overruled *Vasquez*, and after *Staples* confirmed that *Anderson* was correct, the elemental status of the weapon-by-design requirement was placed beyond dispute. Under those cases, a defendant cannot be guilty of violating Section

5861(d) unless he *knows* that the device in his possession is among the explosive, incendiary, poison-gas, or large-projectile devices enumerated in Section 5845(f). And Section 5845(f) instructs that those covered devices do "not include" devices not designed or redesigned "for use as weapons." A defendant found in possession of a device that is not shown to have been designed as a weapon cannot possibly know his device is in fact an explosive bomb if, as Section 5845(f) dictates, there is no such thing as an explosive bomb that is not designed as a weapon. To the extent *Beason* interpreted Section 5845(f) as placing the burden on a Section 5861(d) defendant to prove that a device in his possession was not designed or redesigned as a weapon, that interpretation did not survive *Staples*.

Finally, the conclusion that *Beason* lacks controlling force on these subjects is underscored by the fact that no subsequent panel conducting sufficiency review of a Section 5861(d) case involving a destructive device has deemed itself constrained by *Beason*, or seen fit to address any potential inconsistency. *Harbarger* is the most notable example. But each of the post-*Beason* Fifth Circuit cases in this realm that Mr. Brannan has cited to this point—e.g., *Price*, *Charles*, *Hunn*, *supra*—and many others, have addressed sufficiency challenges regarding a device's design without intimating that the defendant, not the government, bore the burden of persuasion on that point.

*Harbarger* controls. And, under it, Mr. Brannan's intent to design the alleged "destructive device" for use as an explosive weapon was an essential element.

II.    **Mr. Brannan's conviction for knowingly possessing a "destructive device" registerable under the National Firearms Act—specifically, an "explosive bomb"—rests on legally insufficient evidence.**

A.    **Standard of review**

Mr. Brannan's motion for judgment of acquittal at the close of the government's case, and renewed acquittal motions following his own case and the close of all evidence, preserved de novo review of his evidentiary insufficiency claim. *Harbarger*, 46 F.4th at 289. In assessing legal sufficiency of the evidence, this Court reviews that evidence "in the light most favorable to the verdict to determine whether a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Shum*, 496 F.3d 390, 391 (5th Cir. 2007).

B.    **The evidence was insufficient to prove that Mr. Brannan purposefully designed the item in his bedroom closet for use as an explosive weapon.**

As shown above, *Harbarger* sets the governing rule as to the culpable mental state the evidence must have established in order to sustain the jury's verdict. Under that case, the alleged destructive device was an "explosive bomb," and Mr. Brannan could be found to have known of that fact, only if the government proved that he intentionally designed it for use as an explosive weapon.

In this case, *Harbarger* also dictates the outcome of the sufficiency analysis. The government did not attempt to prove the mental state *Harbarger* requires; indeed,

the government strenuously fought for the privilege of *not* having to meet *Harbarger*'s bar, and for the jury *not* to be told to determine whether the evidence cleared that bar. For good reason: as in *Harbarger*, the evidentiary resume the government submitted here would leave a rational juror with ample basis to reasonably doubt that Mr. Brannan purposefully designed the metal item he stored in his bedroom closet as an explosive weapon.

First, as with the explosives-containing bamboo stick in *Harbarger*, the metal item in Mr. Brannan's closet was not constructed such that it clearly could not have been designed for an innocent—i.e., non-NFA proscribed—purpose. The defense's expert, Mr. Hefti, whom the district court found both qualified and credible, testified that the device's overall composition, particularly in light of the absence of components one would expect to find in an improvised explosive weapon (like shrapnel, and metal caps designed to ensure confinement), indicated that the device was designed to emit a pyrotechnic display from the unsealed end, as would a makeshift roman-candle firework. ROA.588-92. Agent McCullough, the government's expert, conceded on cross-examination that, as constructed, the device could have functioned in that manner. ROA.551, 570-71. And the district court itself flagged the item's apparent ambiguity when it observed that "the jury could go either way." ROA.239.

Second, as in *Harbarger*, the government's evidence did not suffice to put Mr. Brannan's intent to create a weaponized explosive beyond reasonable doubt. Indeed,

the deficiencies in the evidence bearing on intended design in the respective cases are remarkably similar. The following is an accurate summary of the government's case (which, recall, was directed at proving the item *could* explode, not that Mr. Brannan intended it to do so as a weapon), and the reasoning behind Agent McCullough's opinion that it was a destructive device:

- The pipe was metal (ROA.490).

- It had an unknown amount of black powder (low explosive) mixed with an unknown, but greater, amount of pyrotechnic stars (low explosive), and an energetic hobby fuse (ROA.491-92, 505-06, 535-36, 543, 546-47, 565).[7]

- If the fuse were lit, there were things that likely would contain gas to some extent on both ends (carboard and clay on one; a five dimes, some wax, and a plastic soda-bottle cap on the other), although neither end was firmly sealed (ROA.537, 543-44).

- If those things in fact created enough true confinement (rather than mere containment), an explosion of unknown intensity "could" occur, and the metal pipe that was about six-inches long, one-inch in diameter, and of unknown thickness, would fragment (ROA.463, 565-66).

- If all of this happened, then fragmented pipe shards and dimes would be propelled with some unknown degree of force, but likely enough to cause some amount of damage within an unknown radius (ROA.538-39, 548).

- Because the pipe was metal and contained some explosive materials, had a fuse, and as constructed "could" produce enough gas confinement to explode, it is a destructive device (ROA.490, 548-51, 565).

---

[7] The weight of the powders combined was 39.7 grams; but the proportion of each is unknown. ROA.505-06, 546-47. No agent testified as to the potential strength or size of explosion that would be reasonable to expect from that amount of those low-explosive powders in an unknown proportion.

The most important, and fatal, similarity is immediately apparent. Like the ATF expert in *Harbarger*, Agent McCullough candidly based his opinion that the item was an "explosive bomb" on (1) his belief that it *could* have exploded if the fuse were lit, and (2) that, *if* the item *were* to explode, the resulting fragmentation of the metal pipe and dimes would be dangerous to those nearby. *See* ROA.295, 538-39, 548. Indeed, a line-by-line comparison is instructive. In *Harbarger*, "the government's only evidence challenging [the defendant]'s testimony that his bamboo stick device was used to scare beavers and destroy their dams (and wasn't very good even at that) was the conclusional testimony of an ATF expert" that "consisted of his saying that the device would fragment on being ignited, and the eruption of two pennies and a plastic bottle cap, along with the bamboo, could destroy property." 46 F.4th at 291.

Here, rather than the defendant, a qualified and credible defense expert testified that the device's components had all the trappings of a makeshift firework save the metal exterior, but that its overall design and construction suggested it was meant to contain, not confine, gas from the firework powder, culminating in the emission of a colorful pyrotechnic display from the fuse-end. ROA.588-92, 610-11, 630. Yet "the government's only evidence challenging" that testimony "was the conclusional testimony of an ATF expert" that "consisted of his saying that the device would fragment on being ignited, and the eruption of [five dimes] and a plastic bottle cap, along with

the [metal of the pipe], could destroy property [or hurt a nearby person]." *Harbarger*, 46 F.4th at 291 (Mr. Brannan's alterations).

As *Harbarger* makes clear, the possibility that an explosives-containing device *could* explode, and could do damage if placed in an inappropriate place, is not sufficient to make it illegal under the NFA; "it must also be *designed* for use as a weapon." 46 F.4th at 291 (*Harbarger*'s emphasis); *accord Hammond*, 371 F.3d at 780. Indeed, a commercial stick of dynamite will of course explode if its fuse is ignited, and if it does so near people it will harm them. But a device not designed to inflict harm or destruction via explosion does not become an NFA "destructive device" based on the harm or destruction it "could" cause if put to malicious or negligent use—such conduct, and the resulting harm, is a matter for state criminal and tort laws. A device is taxable and must be registered and approved by the federal government based only on its inherent design as a weapon, redesign as a weapon, or conversion into a weapon when combined with other parts.

The similarities with *Harbarger* do not stop there. Here, as there, "a government agent merely burned off an unknown amount of the powder contained in the [metal] stick." 46 F.4th at 291 (our alteration).[8] Here, as there, the "government did not admit into evidence the amount [or proportion] of [black powder and pyrotechnic

---

[8] *Accord* ROA.492-93, 506, 528-30, 546-47, 598-99.

31

stars] that w[ere] found within the [metal] stick, the thickness of the wall of the [metal] stick, nor an explanation of the extent of damage that the [metal] stick could cause." *Id.* at 289 n.4 (our alterations).[9] And here, as there, the "government did not test the device beyond ascertaining that it contained [black powder and pyrotechnic stars]; the government did not create replicas and test those devices." *Id.* at 291 (our alteration).[10]

To be sure, the three-quarter-inch-diameter pipe in *Harbarger* was made of bamboo, while the one-inch-diameter pipe here was made of metal. And this *is* a difference between the devices.

But it is not a meaningful one on this record. In this case, the government's own witnesses established that the metal pipe housed none of the types of smaller objects commonly used as shrapnel in true improvised pipe bombs and grenades (like "little bb's," "nails," "screws," or "any other small little metal objects" (ROA.507; *accord* ROA.547)), and Mr. Hefti reinforced this point. ROA.591-92. Moreover, the government's witnesses uniformly conceded on cross-examination that each of the *other* primary components (the clay plugs, the hobby fuse, the black powder, the pyrotechnic stars, the cardboard), while often seen in improvised explosive devices, were regularly or even usually present in commercial fireworks. ROA.491-95, 497-500, 505, 520, 527-30, 543. Mr. Hefti reinforced this point, too. ROA.588-90.

---

[9] *Accord* ROA.529-30, 547, 554-56 570-71, 597-98.
[10] *Accord* ROA.299-300, 558-60, 608.

The metal pipe here thus lacks both features that *Harbarger* highlighted in distinguishing the bamboo device from the metal and plastic devices that this Court and others have deemed sufficiently proven to have been designed for use as pipe bombs. The metal pipe in *Charles*, 883 F.2d at 356-57, had shrapnel inside and, when tested, actually blew up and flung the shrapnel as a grenade would. *See Harbarger*, 46 F.4th at 290 (so emphasizing). And in *United States v. Spoerke*, 568 F.3d 1236, 1243, 1246-47 (11th Cir. 2009), the government made and detonated replicas of the defendant's plastic devices, observing them to explode and disperse fragments up to 200 feet. *See Harbarger*, 46 F.4th at 290-91 (so emphasizing). Unlike in those cases, and like the device in *Harbarger*, Mr. Brannan's metal item had no shrapnel-like objects indicative of design as weaponry and was not tested or replicated.

In the end, all we have here is a small tube not well sealed on one end and unsealed on the other, with a small amount of low-explosive powder mixture inside, that an agent opined, exactly as the agent in *Harbarger* did, was capable of producing an explosion of unknown force, scale, and effect. This was not enough for a rational juror to infer malicious intent to the exclusion of reasonable doubt in *Harbarger*, and it is not enough to do so here either. Because Mr. Brannan's conviction rests on insufficient evidence, this Court should reverse it and remand for entry of judgment of acquittal.

**III.    The district court reversibly erred by failing to instruct the jury that the elements of the charged NFA offense required it to find that Mr. Brannan intentionally designed the alleged destructive device for use as an explosive weapon.**

### A.    Standard of review

"The standard of review of a defendant's claim that a jury charge was inappropriate is whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." *United States v. Vasquez*, 677 F.3d 685, 693 (5th Cir. 2012) (cleaned up).

As noted, jury instructions that fail to accurately convey the essential offense elements violate the Sixth Amendment. *Neder*, 527 U.S. at 11-12. That constitutional error demands a new trial unless the reviewing court "may confidently say, on the whole record, that [it] was harmless beyond a reasonable doubt."[11] *Id.* at 15-16 (quoting *Delaware v. Van Arshdall*, 475 U.S. 673, 681 (1986)). In this context, the harmlessness inquiry requires the court of appeals "to conduct a thorough examination of the record." *Id.* at 19. "If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the

---

[11] For non-constitutional trial errors, the standard for harmlessness requires the appellate court to ask whether the error had "substantial and injurious effect or influence in determining the [jury's] verdict." *United States v. Dominguez-Benitez*, 542 U.S. 74, 81 (2004) (quoting *Kotteakos v. United States*, 328 U.S. 750, 766 (1946)). This standard is "more lenient"—in that the government may satisfy it on a lesser showing—than the beyond-reasonable-doubt standard applicable to constitutional errors. *Id.* at 81 n.7.

error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless." *Id.*

### B. The district court's instructions did not properly convey the mental state required to find Mr. Brannan guilty of the charged offense.

Two essential elements are at issue here. First, the requirement that the item in Mr. Brannan's closet had to be a "firearm" of the "destructive device" variety—specifically, an "explosive bomb." Second, the requirement that Mr. Brannan had to know the characteristics that made the item an "explosive bomb," and thus an NFA firearm. Here, as discussed, both elements depended on the government's ability to persuade the jury of the same essential fact: that Mr. Brannan intentionally designed the item in his closet for use as an explosive weapon—that is, to explode as a means of inflicting bodily injury or physical damage. As to this issue, the first question is whether the district court's instructions conveyed the government's obligation to prove that fact to the jury.

They did not. As Mr. Brannan has noted, the government fought hard to ensure the jury was not so instructed, relying on *Beason*, *supra*, for the proposition that, at most, Mr. Brannan could request the jury be told that *he* bore the burden of *disproving* the culpable mental state. And, over objection, the district court incorrectly agreed. The instructions accordingly did not expressly inform the jury that Mr. Brannan had

to intend to make an explosive weapon in order for it to find that he in fact possessed an unregistered "explosive bomb," and that Mr. Brannan was aware of that fact.

Nor did the instructions impliedly convey the duty to find that requisite intent. As to the device's character, the jury was told only that the government had to prove, and it had to find, "That this destructive device was an explosive bomb." ROA.115-16. Regarding the meaning of those respective terms, the instructions said only: "In this case, the term destructive device means any explosive bomb." ROA.116. As is apparent, these two instructions are hopelessly circular. They provide no insight as to the qualities or features that make something an "explosive bomb." A reasonable juror reading this definition could well think that Mr. Brannan's metal item was covered if it *could* explode as constructed, regardless of whether its designer had been merely negligent or reckless, as opposed to intentional, with respect to that possibility. Most importantly, the definition did not convey a positive duty to find that Mr. Brannan had intended that result.

The instruction directed at *Staples*' knowledge requirement was similarly unil-luminating. It told the jury the government had to prove, and it had to find, "That the defendant knew the characteristics of the destructive device, an explosive bomb." ROA.115-16. But the only guidance the jury received as to the "characteristics" Mr. Brannan had to know was the instruction that, in this case, "the term destructive device means any explosive bomb." ROA.116. As noted, what little guidance that definition

provided, it did not signal that one of the essential characteristics of which Mr. Brannan had to know was that the alleged unlawful device was "designed" to explode, and to do so "for use as a weapon." 26 U.S.C. § 5845(f).

The jury was not instructed on the mental state *Harbarger* required the government to prove beyond reasonable doubt to establish Mr. Brannan's guilt of the charged Section 5861(d) violation. Mr. Brannan was accordingly denied the jury verdict the Sixth Amendment required. As shown below, that constitutional error is not harmless.

### C.     The government cannot show that this instructional error was harmless.

The government's harmlessness burden in this context is to demonstrate beyond reasonable doubt that the improperly instructed jury would have returned the same verdict absent the error. *Neder*, 527 U.S. at 19. *Neder* made clear that the government cannot meet that burden where the defendant "contested the omitted element[s] and raised evidence sufficient to support a contrary finding." *Id.*

That is the case here. The character of the metal item in Mr. Brannan's closet as an "explosive bomb," and his mental state with respect to that contested fact, were the central issues at trial. Those topics were the throughline of all his cross-examinations, and the primary subject of his defense presentation through Mr. Hefti's expert testimony. And the question whether the government had to prove not only that the

item could have exploded and caused injury, but that Mr. Brannan purposefully designed it to do so, was a fiercely contested battle throughout the trial. Indeed, ensuring that the jury was not instructed that it had to find intent to design an explosive weapon, and that its evidentiary burden was therefore lower, was the government's very goal in arguing that Section 5845(f) was best read to make the matter of a device's design as weaponry a matter of affirmative defense.

This is also a case in which "the record contains evidence that could rationally lead to a contrary finding with respect to" the omitted offense element. *United States v. Slaughter*, 238 F.3d 580, 584 (5th Cir. 2000) (quoting *Neder*, 527 U.S. at 19). For the same reasons that in Mr. Brannan's view demonstrate the evidence was insufficient to sustain his conviction, *see supra*, at 27-33, that evidence was at best equivocal as to his intent to design a weapon, as opposed to a makeshift firework. Indeed, the district court expressly highlighted the equivocal nature of the evidence twice, remarking that the government had only "minimally" crossed the threshold to go forward in denying Mr. Brannan's first acquittal motion, ROA.577-78, and registering its view that "the jury could go either way" in the midst of the parties' spirited debate over the correct instruction at the charge conference. ROA.239.

As instructed, the jury was relieved of its duty to find beyond reasonable doubt that Mr. Brannan in fact intended to make the kind of weapon the NFA forbade him to possess. That issue was hotly contested. And there is ample reason to think that a

properly instructed jury would have cause to reasonably doubt that Mr. Brannan possessed the will of a bomb maker, rather than that of a life-long fireworks enthusiast, in constructing the metal item that he openly tinkered with at the kitchen table and slept next to in the bedroom closet. This instructional error was not harmless. Accordingly, even if the evidence was legally sufficient, this Court should vacate Mr. Brannan's conviction and remand for a new trial before a properly instructed jury.

# CONCLUSION

This Court should reverse Mr. Brannan's conviction as resting on insufficient evidence and remand for entry of judgement of acquittal. Alternatively, this Court should vacate the conviction and remand for retrial before a jury properly instructed as to the culpable mental state for the charged violation of the National Firearms Act.

Respectfully submitted,

MARJORIE A. MEYERS
Federal Public Defender
Southern District of Texas

s/ *Evan G. Howze*
EVAN G. HOWZE
Assistant Federal Public Defender
Attorneys for Appellant
440 Louisiana Street, Suite 1350
Houston, Texas 77002
Telephone: (713) 718-4600

# CERTIFICATE OF SERVICE

This brief was served upon counsel for the appellee by notice of electronic filing with the Fifth Circuit CM/ECF system.

s/ *Evan G. Howze*
EVAN G. HOWZE

# CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) & (f) because it contains 9,829 words.

2.   This brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared with the current version of Microsoft Word software, Microsoft Office 365 edition, using the proportionally spaced, Times New Roman typeface in both the text (14-point) and footnotes (12-point).

3.   This brief was filed electronically, in native Portable Document File (PDF) format, via the Fifth Circuit's CM/ECF system.

4.   This brief complies with the privacy-redaction requirement of 5th Cir. R. 25.2.13 because it has been redacted of any personal data identifiers.

5.   This brief complies with the electronic-submission requirement of 5th Cir. R. 25.2.1 because it is an exact copy of the paper document.

6.   This brief has been scanned for viruses with the most recent version of a commercial antivirus scanning program and is free of viruses.

s/ *Evan G. Howze*
EVAN G. HOWZE